NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| GLADYS JIMENEZ, | : | |
| | : | |
| Plaintiff, | : | Hon. Dennis M. Cavanaugh |
| | : | |
| v. | : | **OPINION** |
| | : | |
| | : | Civil Action No: 10-4027 (DMC) |
| MICHAEL J. ASTRUE, | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon  appeal by Gladys Jimenez ("Plaintiff") from the final decision of the Commissioner of Social Security ("Commissioner"), denying Plaintiff's claims for a period of disability and disability insurance benefits under Title II of the Social Security Act ("the Act"), and for Supplemental Security Income ("SSI") under Title XVI of the Act.  This Court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  No oral argument was heard pursuant to Rule 78 of the Federal Rules of Civil Procedure.

As detailed below, the final decision entered by the Administrative Law Judge ("ALJ") must be **affirmed in part,** and **remanded** on the limited issue of the ALJ's step 5 hypothetical posed to the vocational expert which failed to include a description of all Plaintiff's maladies and impairments.

1

# I.  BACKGROUND

## A.  PROCEDURAL HISTORY

On July 28, 2005, Plaintiff filed an application for a period of disability and disability insurance benefits, alleging disability due to injuries sustained in a motor vehicle accident (the "Accident") beginning November 25, 2002.  (Administrative Transcript ( "Tr.") 40, 114).  Plaintiff applied for SSI under the Act on August 9, 2005.  (Tr. 74).  Plaintiff's claim was  initially denied on January 24, 2006 (Tr. 43-45), and upon reconsideration on April 19, 2006.  (Tr. 49-51).  Thereafter, Plaintiff requested a hearing before an ALJ on June 20, 2006.  (Tr. 52-53).  On November 16, 2007, a hearing was held before the Honorable Joel H. Friedman, ALJ.  (Tr. 19).  Vocational expert Pat Green appeared and testified as to the severity and impact of Plaintiff's conditions on her ability to work.  (Tr. 603-19).  The ALJ denied Plaintiff's claims on August 15, 2008.  (Tr. 19-39).  Plaintiff sought review of the decision, but the Appeals Council denied her request on June 2, 2010.  (Tr. 3-5).  On December 7, 2010, Plaintiff filed a timely complaint with this Court seeking judicial review.

## B. FACTUAL HISTORY

### 1. The Findings of the Administrative Law Judge

ALJ Friedman made the following eleven (11) findings regarding Plaintiff's application for disability insurance benefits and SSI: (1) the claimant met the insured status requirements of the Act through June 30, 2004; (2) the claimant has not engaged in substantial gainful activity since November 25, 2002, the alleged onset date; (3) the claimant has the following severe impairments: degenerative disc disease, depression, and an anxiety disorder; (4) the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"); (5) the claimant has the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except the claimant would be limited to simple, routine, one to two step jobs, in a low contact, low stress setting, and she is limited in her ability to perform such postural activities as climbing, balancing, stooping, kneeling, crouching and crawling occasionally; (6) the claimant is unable to perform any past relevant work; (7) the claimant was born on March 27, 1965, and was 42-years-old[1], which is defined as a "younger individual," on the alleged disability onset date; (8) the claimant has at least a high school education and is able to communicate in English; (9) transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled; (10) considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform; (11) the claimant has not been under a disability, as defined in the Act, from November 25, 2002, through the date of this decision.  (Tr. 19-39).

## 2.  Plaintiff's Medical History and Evidence

Plaintiff alleges that she has been disabled since November 25, 2002 due to back and neck injuries, depression, and anxiety resulting from her Accident.  (Tr. 117).  On the date of the alleged disability onset, Plaintiff was 37 years of age.  (Tr. 148).  Prior to the Accident, Plaintiff reported no significant medical history, and denied drug, prescription medication, alcohol, and tobacco use.  Id. The Court summarizes Plaintiff's medical history and the evidence pertaining to her impairments below.

---

[1] The alleged disability onset date was November 25, 2002, making Plaintiff 37 years of age.  The medical records indicate the correct age of the Plaintiff.  The incorrect finding by the ALJ  is harmless and has no substantive effect on the merits of this matter.  The Court notes the discrepancy only to ensure accuracy.

*i. General Medical History*

On November 25, 2002, the date of the Accident, Plaintiff was transported to the emergency room at JFK Medical Hospital complaining of chest pain.  Id.  Plaintiff was oriented and alert; she exhibited no language barriers; her affect, speech, and eye contact were normal; her motor behavior and ideations were cooperative; and her gait was steady and brisk.  (Tr. 141-42).  Dr. Helmi Saud ordered a chest x-ray after Plaintiff complained of minor chest and back discomfort.  (Tr. 148).  Results from the x-ray test were normal, and Plaintiff was discharged from the hospital in a stable and ambulatory condition.  (Tr. 149).  Plaintiff was instructed to take Motrin to alleviate her discomfort.  (Tr. 146).

Plaintiff was examined by Dr. Ivan Krohn at the Wellness Center on December 4, 2002.  (Tr. 161).  Plaintiff reported sleep disturbances, headaches, and difficulties rising from a sitting position.  Id.  A physical examination showed a limited range of motion in Plaintiff's neck, which Plaintiff described as being painful in all directions.  Id.  Dr. Krohn noted marked trigger point tenderness in Plaintiff's upper back and joint tenderness in her lower back.  Id.  Dr. Krohn diagnosed Plaintiff with upper back, neck, and lower back strains, and prescribed Vicodin and Roboxim for the pain.  (Tr. 161).  In a follow-up examination on December 11, 2002, Plaintiff complained of pain in her lower back, especially while sitting and climbing the stairs, headaches, and neck tenderness.  Id.  Dr. Krohn diagnosed Plaintiff with upper and lower back strain, neck strain and tension headaches.  Id.

Plaintiff returned to Dr. Krohn's office on January 8, 2003 complaining of sleep disturbances, headaches, and pain in her neck, right leg, and back.  (Tr. 162).  Dr. Krohn described Plaintiff's gait as slow and guarded, and noted no noticeable improvement in Plaintiff's recovery.  Id.  Medical records from follow-up visits on February 26, 2003 and April 9, 2003 note continued upper chest

4

soreness, rib and lower back tenderness, neck and lower back pain, stiffness, and headaches.  (Tr. 162, 165).  Dr. Krohn recommended steroid injections in Plaintiff's neck and back, physical therapy, and a chest x-ray. (Tr. 165).  The chest x-ray results were unremarkable.  (Tr. 231).  On May 21, 2003, Plaintiff saw Dr. Krohn after experiencing pain flare-ups in her lower back.  (Tr. 170).  Physical examination findings showed marked supraclavicular, suprascapular, and occipital trigger point tenderness.  Id.  Dr. Krohn indicated that straight leg raises caused Plaintiff jolts of mid and lower back pain, but noted no point tenderness in Plaintiff's back.  Id.  On June 18, 2003, Plaintiff returned for what appears to be the last time to Dr. Krohn's office.  Id.

On November 22, 2004, Plaintiff was seen by Dr. Shahid Latif at Clara Barton Cardio Medical Associates.  (Tr. 547).  Remarkably, Plaintiff did not report any pain in her neck, back, or legs.  Id.  Plaintiff's physical examination was unremarkable.  Id.  When Plaintiff returned to Dr. Latif's office on December 21, 2004, she reported that she felt "okay" and denied any chest pain.  (Tr. 550).  Plaintiff returned to Dr. Latif's office on June 13, 2005 complaining of increased pain in her right knee.  Id.  Dr. Latif prescribed pain medication and encouraged Plaintiff to visit the emergency room.  Id.  Plaintiff was subsequently seen by Raritan Bay Medical Center emergency room physician Dr. Subramanyam.  (Tr. 400).  Dr. Subramanyam noted that Plaintiff's right knee was slightly swollen and tender, but reported that  the knee had full range of motion.  (Tr. 401).  An x-ray of the right knee showed no acute fracture.  Id.

As part of Plaintiff's disability determination, a consultative examination was performed by Dr. Ronald Bagner on December 15, 2005.  (Tr. 423-25).  Plaintiff reported pain in her lower back, neck and right knee, and complained of numbness in her legs and weakness in her right hand.  (Tr. 423).  At the time, Plaintiff reported taking several pain medications, including Nabumetone,

Cymbalta, Cyclobenzaprine, and Zoloft.  Id.  Dr. Bagner noted that Plaintiff ambulated with a cane, exhibited a cautious gait, got on and off the examination table with marked difficulty, needed assistance in getting dressed and undressed, and was comfortable in the seated position.  (Tr. 424). Dr. Bagner found no abnormalities in Plaintiff's upper extremities, but noted hypersensitivity to light palpation in those regions.  Id.  Despite the fact that Plaintiff would not allow range of motion testing in her shoulders, wrists, elbows, forearms, lower back, ankles, or knee, she exhibited normal ranges of movement in those areas during spontaneous activity, and was able to make a fist with both hands and oppose both thumbs.  Id.  Dr. Bagner found no evidence of atrophy in Plaintiff's legs.  Id.  Dr. Bagner diagnosed Plaintiff with non-inflammatory joint pain, and noted that there were no objective findings to correlate with Plaintiff's use of a cane to ambulate.  Id.

On July 25, 2006, Plaintiff returned to Dr. Latif's office complaining of lower back pain and right knee pain.  (Tr. 549).  Dr. Latif prescribed Naprosyn 500 mg, referred Plaintiff to an orthopedist, and advised Plaintiff to have x-rays taken.  Id.  Results of the x-rays taken on Plaintiff's right knee, cervical spine, and left shoulder were normal.  (Tr. 559-60).

On April 3, 2007, Plaintiff was examined by Dr. Neville Mirza, a neurologist.  (Tr. 465-67). Plaintiff complained of severe neck pain, shooting pain from her back into her left leg, and numbness in her left leg.  (Tr. 465).  Dr. Mirza noted that Plaintiff's neck and back showed tightness with paravertebral muscle spasms, range of motion in her neck was 75 percent of normal, extreme lateral rotation and deep palpation existed on the left side of her neck, a compression test caused pain in her neck and numbness in her left hand, her range of motion was diminished, she was unable to heel and toe walk, her left knee reflexes were normal, and her right knee reflexes were hypoactive.  (Tr. 466). Dr. Mirza examined Plaintiff's five year-old MRI scans and saw no true herniation, although the

6

images showed bulging discs in Plaintiff's neck and back.  Id.  On April 30, 2007, Dr. Mirza referred Plaintiff to the Perth Amboy Diagnostic Imaging Center for MRI tests of the cervical and lumbar spine.  (Tr. 469-72).  The MRI images revealed disc bulging with some facet hypertrophy, but revealed no intrinsic cord abnormality.  Id.

On May 14, 2007, Plaintiff saw Dr. Sri Kantha, an orthopedic surgeon.  (Tr. 521-23). Plaintiff complained of radiating pain on the left side of her neck, bilateral numbness and tingling, lower back pain that was aggravated with walking, and radiation of pain to her lower right side extremities.  Id.  Dr. Kantha reported that Plaintiff's cervical range of motion was 50 percent, her lumbar range of motion was 30 percent, and her motor strength was grossly diminished in the lower extremities. (Tr. 522).  Given Plaintiff's reports of constant pain, Dr. Kantha recommended steroid injection treatments, which were administered on May 31, 2007.  (Tr. 523-24).  On October 10, 2007, Plaintiff returned to Dr. Kantha's office to follow up on the injections.  (Tr. 526).  Dr. Kantha noted that Plaintiff showed a 30 percent improvement in her lower back and left leg symptoms.  Id. Despite improvements, Plaintiff maintained complaints of pain caused by movement and sitting. Id.  A physical examination showed no tenderness to palpation or gross swelling in Plaintiff's lower back and cervical spine, and Plaintiff's right knee appeared to be grossly normal.  Id.

*ii. Chiropractic Evaluations and Treatment*

On December 3, 2002, Plaintiff began chiropractic treatments with Dr. Lewis Korb at Longevity Medical Center.  (Tr. 152).  Plaintiff complained of headaches, depression, nausea, memory problems, tenseness, dizziness, weakness, nervousness, loss of balance, tiredness and pain in her neck, head, arm, back, hip, and chest.  Id.  Dr. Korb evaluated Plaintiff's range of motion in her cervical and dorsolumbar spine to be between 40 and 65 percent of normal, her shoulder range

of motion to be between 60 and 80 percent of normal, and her hip range of motion was between 45 and 60 percent of normal.  (Tr. 153-55).  Testing of these regions was remarkable with respect to dural adhesions, nerve root compression, space occupying lesions of the cervical region, sciatic nerve compression, lumbar disc protrusion, and sacroliac joint lesions.  (Tr. 155).  Dr. Korb diagnosed Plaintiff with cervical and lumbar radiculitis (pinched nerve), spine subluxation (misalignment of spinal vertibrae), shoulder strain, and headaches.  (Tr. 191).

An MRI of Plaintiff's cervical spine performed by Dr. Ashok R. Babaria at Perth Amboy Diagnostic Imaging on December 2, 2002 showed a straightening of Plaintiff's lower back and mild bulging discs.  (Tr. 229).  An MRI of Plaintiff's lower back showed bulging discs and paraspinal muscular atrophy, but no true herniation was noted by Dr. Neville Mizra.  (Tr. 229, 466).  EMG and nerve condition studies completed on March 11, 2003 by Dr. V. Rimerman, a neurologist at The American Association of Electrodiagnostic Medicine, revealed normal latencies in all nerves, normal insertional muscle activity, normal motor action potentials, and normal recruitment patterns.  (Tr. 201).  Dr. Rimerman's impression suggested right cervical and left lumbosacral slipped dics.  Id.

Plaintiff returned to Dr. Korb's offices for a follow-up examination on January 3, 2003.  (Tr. 232).  In addition to her previous complaints, Plaintiff reported pain in her shoulders, a cold sensation in her hands and feet, and increased pain with walking, sitting and climbing.  (Tr. 232, 234).  On her twentieth visit to Dr. Korb's offices (on January 28, 2003), Plaintiff reported that she started feeling "a little better," and reported overall improvement through her final visit on April 4, 2004.  (Tr. 249-74).  Maricel Lazo, a physical therapist at Longevity Medical, assessed Plaintiff's rehabilitation potential as good and fair throughout treatment, and reported that Plaintiff's condition consistently showed slow improvement. (Tr. 292, 275-367).  Notably, a Disability Report completed

8

by Dr. Korb during Plaintiff's last visit indicated that Plaintiff was not totally disabled, and would be able to begin working "A.S.A.P." (Tr. 160).

### iii. Psychiatric Review and Treatment

On August 1, 2005, Plaintiff was treated for symptoms of depression and anxiety by Dr. Miguel Koschel at the Sunrise Institute for Mental Health. (Tr. at 533). Plaintiff reported no past psychiatric history and complained of depression, insomnia, lack of energy, and irritability. Id. Dr. Koschel reported that Plaintiff's grooming was casual, she was oriented, her memory and thought processes were intact, her attitude was guarded, her behavior was unremarkable, her affect was flat, she was not suicidal, her judgment and insight were fair, and her eye contact was poor. (Tr. 537-39). Dr. Koschel's impression in a September 26, 2005 report was that Plaintiff was limited in her ability to understand, remember, sustain concentration and attention, socially interact, and use public transportation, but reported that Plaintiff had no problems managing money or preparing meals occasionally. (Tr. 414-15). Dr. Koschel noted that Plaintiff had slightly improved with treatment, despite the fact that she had been somewhat noncompliant. (Tr. 416).

On November 1, 2005, Plaintiff's psychiatrist, Dr. Carmencita Temporsa-Lanez, submitted a psychiatric report that Plaintiff was being treated on a monthly basis for depression and anxiety. (Tr. 417-22). Dr. Lanez reported that Plaintiff was alert and oriented, did not have suicidal ideations or hallucinations, her mood was depressed, her affect and speech were appropriate, her concentration was poor, and her memory and judgment were fair. (Tr. 418-19). In Dr. Lanez's opinion, Plaintiff could perform activities of daily living, but was limited in her abilities to do work- related mental activities due to her forgetfulness and isolation. (Tr. 420, 21). Dr. Lanez's notes show that in a November 1, 2005 visit, Plaintiff's symptoms were better, her sleep had improved, and her mood

was fine.  (Tr. 463).  Dr. Lanez saw Petitioner twice more, on December 12, 2005 and January 12, 2006, and each time prescribed Zoloft to treat Plaintiff's depression.  (Tr. 464).

As part of Plaintiff's disability determination, a mental status examination was conducted by Dr. Pradip Gupta on December 19, 2005.  (Tr. 428-30).  Plaintiff reported that she became depressed after her Accident, and shared that antidepressant medications were effective in treating her symptoms.  (Tr. 428).  Plaintiff stated that she had difficulty with housework, sitting, bending, stooping, and standing.  Plaintiff was able to follow a three-step command, her immediate recall was three out of three in three minutes and two out of three in five minutes, her abstract reasoning was poor, her insight and judgment were average, and she exhibited no suicidal ideations.  (Tr 430).  Dr. Gupta diagnosed Plaintiff with chronic depressive reaction secondary to chronic pain syndrome related to her Accident and assessed her global functioning[2] ("GAF") at 45.  (Tr. 429).

### iv. Mental Residual Functional Capacity Assessment

As part of Plaintiff's disability determination, a mental RFC assessment was completed by Dr. J. Shapiro on January 9, 2006.  (Tr. 431-33).  Dr. Shapiro diagnosed Plaintiff with affective and anxiety-related disorders, and recorded "moderate" limitations with regards to Plaintiff's restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace.  (Tr. 437, 447).  Dr. Shapiro's report indicated no significant limitations in Plaintiff's ability to understand and remember locations, work-like procedures, and detailed instructions; or Plaintiff's ability to carry out simple instructions, sustain

---

[2]  The GAF scale measures a patient's overall psychological, social, and occupational functioning on a hypothetical continuum.  A score falling within the range of 41-50 indicates that the patient shows serious symptoms or any serious impairment in social, occupational, or school functioning.  American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed., text rev. 2000).

10

an ordinary routine, work in coordination or proximity to others without being distracted, and make simple work-related decisions. (Tr. 431). Plaintiff exhibited moderate limitations in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods of time, to adhere to a schedule, to respond to changes in the work setting, to complete normal work days and weeks without interruptions from her psychological symptoms or unreasonable rest periods, and to interact with the general public. (Tr. 431-32). Plaintiff showed no significant limitation in interacting with coworkers, maintaining socially acceptable behavior, accepting instructions, taking precautions to normal hazards, using public transportation, or setting realistic goals and independent plans. Id.

*vi. Physical Residual Functional Capacity Assessment*

On January 23, 2006, a physical RFC assessment was completed by Dr. E. B. Atienza. (Tr. 451-58). With regard to exertional limitations, Plaintiff could occasionally lift 50 pounds, frequently[3] lift 25 pounds, stand and/or walk with normal breaks for six hours in an eight-hour work day, sit with normal breaks for six hours in an eight-hour work day, and push and pull without limitations. (Tr. 452). Dr. Atienza found that Plaintiff could occasionally climb ramps, stairs, ladders, ropes and scaffolds; frequently balance, stoop and crouch; and occasionally kneel and crawl. (Tr. 453). Dr. Atienza's report indicated no manipulative, visual, communicative, or environmental limitations. (Tr. 276–78). Dr. Atienza concluded that Plaintiff's symptoms of pain were related to her back sprain/strain, were not proportionate to what can be expected on the basis of the established medical findings, and were not consistent with the evidence on the record. (Tr. 456).

---

[3] "Frequently means occurring one-third to two-thirds of an 8-hour day (cumulative, not continuous). Occasionally means occurring from very little up to one-third of an 8-hour workday (cumulative, not continuous)." (Tr. at 451).

### 2. Plaintiff Gladys Jimenez's Testimony

Plaintiff testified on her own behalf, with the help of a Spanish translator, at the ALJ hearing held on November 16, 2007. (Tr. 577). Plaintiff was unable to answer many of the ALJ's questions, allegedly due to memory loss and headaches. (Tr. 583-603). Plaintiff testified that she lives with her husband and two sons, aged eighteen and nineteen. (Tr. 582). She is unable to do any kind of housework, so her sons and husband take care of the home. (Tr. 591). Plaintiff immigrated to the United States from Puerto Rico in or around 1987. (Tr. 582). Plaintiff earned a General Equivalency Diploma in the United States, but could not recall when.[4] Plaintiff could not remember whether she worked as a telemarketer, despite the fact that she reported such a job in her disability benefits application. (Tr. 584). She could, however, remember working as a hairdresser, and vaguely remembered two warehouse jobs, one where she "deal[t] with papers," and another where she tagged clothing. (Tr. 594-95, 607). Plaintiff recalled working as a clerk for Popular Club before her allegedly disabling Accident. (Tr. 594). She testified that she had done "a little bit of everything" at Popular Club, including write reports and lift 20-30 pound boxes. (Tr. 585, 594).

Plaintiff claims that, due to her alleged disability, she is unable to perform any kind of work or do anything during the day in addition to her doctor visits. (Tr. 591, 600). Plaintiff testified that the pain in her lower back radiates to her legs, arms, hands and neck, and causes numbness in her hands, legs, and toes. (Tr. 598). The pain is exacerbated by movement, walking, sitting, and standing. (Tr. 600). Plaintiff cannot walk more than one block at a time due to the pain, and uses a cane to ambulate. (Tr. 592). Plaintiff testified that she could not perform a job requiring long

---

[4] ALJ Friedman pointed out that Plaintiff stated in her Application for Disability Insurance Benefits that she returned to school full time from 1996-1999, but Plaintiff claimed she could not remember going to school or when she earned her GED. (Tr. at 75, 583).

12

periods of sitting because the position makes her legs go numb.  (Tr. 593).  She also complained of weakness in her right hand.  (Tr. 595).  Plaintiff is currently taking several medications, including Hydrocodone APAP 5-500, Oxycontin, and Ciprofloxacin HCL, but claims that these medications are never effective.  (Tr. 586, 589, 602).  Plaintiff stated that her current medications were accidentally left at home, but presented the ALJ with a bag containing several containers, all empty, of previously prescribed pain medications.  (Tr. 586-87).

### 3.  Vocational Expert Ms. Pat Green's Testimony

Vocational expert Pat Green testified at the ALJ hearing held on November 16, 2007.  (Tr. 604).  Ms. Green characterized Plaintiff's past employment as a ticket tagger to be unskilled at a light level, as a hair stylist to be skilled at a light level, as a shipping clerk to be semiskilled at a light level, and as a telemarketer to be semiskilled at a sedentary level.  (Tr. 609-10).  Ms. Green testified that an individual who does not communicate fully in English but who is capable of performing sedentary work in simple one to two-step jobs in a low contact, low stress setting that limits postural activities would not be able to perform any of her past relevant work.  (Tr. 611-12).  However, such a person could perform other simple, unskilled, low-stress jobs, including toy and sporting equipment stuffer, sorter, hand bander, tagger, garment sorter, assembler of small products, and hand packer, but such a person would not be able to perform such jobs if they suffered from a condition that causes pain and concentration difficulties throughout the day.  (Tr. 612-16).

## II.  STANDARD OF REVIEW

A reviewing court will uphold the Commissioner's factual decisions if they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000).  Substantial evidence is "more than a mere scintilla . . . but may be less than a

preponderance." Woody v. Sec'y of Health & Human Servs, 859 F.2d 1156, 1159 (3d Cir. 1988).

It "does not mean a large or considerable amount of evidence, but rather such relevant evidence

which a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood,

487 U.S. 552, 565 (1988) (citation omitted).  Not all evidence is considered "substantial."   For

instance,

> [a] single piece of evidence will not satisfy the substantiality test if
> the [Commissioner] ignores, or fails to resolve, a conflict created by
> countervailing evidence.  Nor is evidence substantial if it is
> overwhelmed by other evidence–particularly certain types of evidence
> (e.g. that offered by treating physicians)–or if it really constitutes not
> evidence but mere conclusion.

Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting Kent v.

Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)).  The ALJ must make specific findings of fact to

support his ultimate conclusions.  Stewart v. Secretary of Health, Educ. and Welfare, 714 F.2d 287,

290 (3d Cir. 1983).

The "substantial evidence standard is a deferential standard of review."  Jones v. Barnhart,

364 F.3d 501, 503 (3d Cir. 2004).  As such, it does not matter if this Court "acting de novo might

have reached a different conclusion" than the Commissioner.  Monsour Med. Ctr. V. Heckler, 806

F.2d 1185, 1190-91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d

Cir. 1986)).  "The district court . . . is [not] empowered to weigh the evidence or substitute its

conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992)

(citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).  A Court must nevertheless "review

the evidence in its totality."  Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (citing

Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984).  In doing so, the Court must "take into account

14

whatever in the record fairly detracts from its weight."  Willibanks v. Sec'y of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988)).

To properly review the findings of the ALJ, the court must have access to the ALJ's reasoning.  Accordingly,

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that [her] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec'y of Health, Educ. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977)).  A court must further assess whether the ALJ, when confronted with conflicting evidence, "adequately explain[ed] in the record [his] reasons for rejecting or discrediting competent evidence."  Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  If the ALJ fails to properly indicate why evidence was rejected, the court is not permitted to determine whether the evidence was discredited or simply ignored.  See Burnett v. Comm'r of Soc. Sec, 220 F.3d 112, 121 (3d Cir. 2000) (citing Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)).

## III.  APPLICABLE LAW

### A.  THE FIVE-STEP PROCESS

A claimant's eligibility for benefits is governed by 42 U.S.C. § 1382.  A claimant is considered disabled if she is unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A).  A claimant bears the burden of establishing her disability.  Id. §

15

423(d)(5).  The Social Security Administration has established a five-step process or determining whether an individual is disabled.  20 C.F.R. §§ 404.1520(a) and 416.920(a).

At step one, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Substantial gainful activity is work activity that is both substantial and gainful.  "Substantial work activity" is work activity that involves doing significant and productive physical or mental duties.  20 C.F.R. §§ 404.1572(a) and 416.972(a).  "Gainful work activity" is work that is done (or intended) for pay or profit.  20 C.F.R. §§ 404.1572(b) and 416.972(b).  If an individual engages in substantial gainful activity, she is not disabled regardless of how severe her physical or mental impairments are.  20 C.F.R. §§ 404.1520(b) and 416.920(b).   If the claimant establishes that she is not currently engaged in such activity, the analysis proceeds to the second step.  Id.

The Commissioner, under step two, must determine whether the claimant suffers from a severe impairment or combination of impairments.  20 C.F.R. §§ 404.1520(c) and 416.920(c). Under the Regulations, the Commissioner must "consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  20 C.F.R.§ 404.1523.  An impairment or combination of impairments is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities."  Id.  If a claimant does not have a severe impairment or combination of impairments, she is not disabled. Conversely, if the Commissioner finds a severe impairment or combination of impairments, the analysis proceeds to step three.

The analysis under step three requires a determination as to whether the claimant's impairment(s) is equal to, or exceeds, one of those included in the Listings.  20 C.F.R. §§

16

404.1520(d) and 416.920(d).  Upon such a finding, the claimant is presumed to be disabled and is automatically entitled to benefits.  Id.  If, however, the claimant does not meet this burden, the Commissioner moves to the next step.

Before considering step four, the Commissioner must determine the claimant's RFC, which is the claimant's ability to perform physical and mental work activities on a sustained basis despite limitations from his impairments .  20 C.F.R. §§ 404.1520(e) and 416.920(e); 20 C.F.R. §§ 404.1545 and 416.945.  A claimant's RFC is based on consideration of all relevant medical and subjective evidence in the case record.  20 C.F.R. §§ 404.1520(e) and 416.920(e).  Once the claimant's RFC is determined, the analysis moves to step four.

Step four requires the Commissioner to determine whether the claimant has the RFC to perform the requirements of her past relevant work.  20 C.F.R. §§ 404.1520(f) and 416.920(f).  If the claimant can return to her previous employment, she is not disabled, and therefore cannot obtain benefits.  Id.  If, however, the Commissioner determines that the claimant is unable to return to her past relevant employment, the analysis proceeds to step five.

The fifth, and final, step requires the Commissioner to determine whether the claimant can perform other work consistent with her medical impairments, age, education, past work experience and RFC.  20 C.F.R. §§ 404.1520(g) and 416.920(g).  If the claimant is unable to perform other work and meets the duration requirement, she will be found to be disabled.  20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v).  If the claimant is able to do other work, she is not disabled. Although the claimant continues to bear the burden of proving disability at this step, a limited burden is shifted to the Social Security Administration to provide evidence that demonstrates that other work

17

exists in significant numbers in the national economy that the claimant can perform.  20 C.F.R. §§ 404.1512(g) and 416.912(g).

### B.  THE REQUIREMENT OF OBJECTIVE EVIDENCE

Under the Act, disability must be established by objective medical evidence.  An individual is not considered to be disabled unless she "furnishes such medical and other evidence of the existence thereof as the Secretary may require."  42 U.S.C. § 423(d)(5)(A).  Notably, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section."  Id.  Specifically, a finding that one is disabled requires:

> [M]edical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph . . . would lead to a conclusion that the individual is under a disability.

Id.; see 42 U.S.C. § 1382c(a)(3)(A).  Credibility is a significant factor.  When examining the record:

> The adjudicator must evaluate the intensity, persistence and limiting effects of the [claimant's] symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work-related activities. To do this, the adjudicator must determine the credibility of the individual's statements based on consideration of the entire case record.

20 C.F.R. § 416.929(c)(4).  A claimant's symptoms, then, may be discredited "unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."  20 C.F.R. § 416.929(b); see Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).

18

## IV.  ANALYSIS

On appeal, Plaintiff argues that the ALJ erred in denying her claims for three reasons.  First, Plaintiff asserts that the ALJ failed to combine and compare all of her severe impairments at step three when he determined that her impairments did not medically equal the Listings.  (Plaintiff's Brief (Pl. Br.) 8).  Plaintiff further claims that her physical and mental impairments separately satisfy the requirements of Listing 1.04.  Second, Plaintiff argues that the ALJ improperly assessed her RFC.  (Pl. Br. 21).  Finally, Plaintiff claims that the ALJ's hypothetical question posed to the vocational expert at step five did not include all of Plaintiff's limitations.  Id.  Because the ALJ properly determined that Plaintiff's back and neck impairments, both separately and combined, do not meet the requirements of Listing 1.04 and engaged in a proper evaluation of Plaintiff's RFC at step four, Plaintiff's appeal on these grounds is denied.  Because the ALJ failed to include all of Plaintiff's limitations in his step five hypothetical, however, this matter is remanded solely on that basis.

### A. STEP THREE CLAIM

#### i.  Lumbar and Cervical Impairments

Plaintiff first contends that the ALJ did not make sufficient findings of fact to support his conclusion that her lumbar impairments do not meet the requirements of Listing 1.04.  (Pl. Br. 12).  Next, Plaintiff argues that the ALJ failed to analyze Plaintiff's cervical injuries against the Listings separate and apart from his analysis of her lumbar pathology.  (Pl. Br. 11).  Plaintiff finally argues that the ALJ improperly disregarded 20 C.F.R. § 404.1526(a), which  requires a comparison of the joint effect of Plaintiff's "constellation" of impairments against the Listings in order to determine medical equivalence. (Pl. Br. 9).

a. The ALJ Properly Determined that Plaintiff's Back Impairments Do Not Satisfy the Requirements of Listing 1.04.

Plaintiff first claims that her back impairments satisfy the requirements of Listing 1.04(A) because she suffers from degenerative disc disease, nerve root compression, neuro-anatomic distribution of pain, limitation of spinal motion, muscle weakness, and sensory loss. (Pl. Br. 12-13). Putting aside the fact that Plaintiff herself submits that she does not suffer from degenerative disc disease (Pl. Br. 10), her first argument is unavailing because substantial evidence in the record supports the ALJ's finding that Plaintiff's impairment does not satisfy the requirements of Listing 1.04, which requires a showing of a "disorder of the spine, resulting in compromise of a nerve root or the spinal cord with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and positive straight-leg raising test." 20 C.F.R. Part 404, Subpart P, Appendix 1.

Plaintiff argues that she suffers from a spinal disorder evidenced by nerve root compression, allegedly due to bulging discs. (Pl. Br. 13). Even though Plaintiff asserts that "there isn't a 50 year old person alive who doesn't suffer from some bulging and degeneration of one or more discs through the natural aging process," she claims, without proof, that the "encroachment [of her spinal discs] upon the thecal sac and epidural fats" revealed in a December 4, 2002 MRI is nerve root compression. Id. Plaintiff supports this theory with evidence that she suffered sensory loss and motor limitations. Id. Here, Plaintiff misinterprets the medical evidence. Although the December 4, 2002 MRI showed signs of disc bulging, Dr. Mizra found no signs of herniation in Plaintiff's cervical or lumbar spine. (Tr. 466). Further, a 2007 MRI shows disc bulging, but no intrinsic cord abnormality. (Tr. 559-60). Additionally, x-rays of Plaintiff's cervical spine taken on July 25, 2006

20

were normal.  (Tr. 559-60).  Thus, substantial medical evidence does not support an existence of nerve root compression.

As to sensory loss, Plaintiff relies on Dr. Korb's November 9, 2003 report that noted hyperesthesia in Plaintiff's left L2, L3, L4, S1 and S2 spinal regions.  (Pl. Br. 13, Tr. 56).  While Plaintiff claims Dr. Korb's diagnosis shows that she suffered sensory loss, in fact, hyperesthesia is the medical term for a pathological increase in sensitivity.[5]  Plaintiff also relies on Dr. Mizra's findings of grossly diminished motor strength to argue that she suffers from motor loss and limitation of motion.  (Pl. Br. 13).  In assessing Plaintiff's motion limitations, the ALJ noted that Plaintiff exhibited normal range of spinal movement during spontaneous activity, and noted that DDS and limited MRI findings do not support the degree of limitation Plaintiff asserts.  (Tr. 30, 37).  The ALJ also considered medical reports from Plaintiff's physicians, Dr. Korb and Dr. Mirza, that reported diminished range of motion in Plaintiff's spinal regions, but ultimately found such reports to be unpersuasive, given the conflicting medical evidence and Plaintiff's lack of credibility.  (Tr. 30).

It is evident that the ALJ appropriately weighed all medical evidence of record in fashioning his decision.  (Tr. 22-37).  The ALJ's lengthy discussion of the evidence appropriately aids this Court in fulfilling its duty to scrutinize the record as a whole to determine whether the ALJ's conclusions are rational.  See Ogden, 677 F. Supp. at 278.  Throughout Plaintiff's extensive medical history, only her chiropractor, Dr. Korb, noted signs of nerve root compression.  (Tr. 155).  On April 12, 2004, however, Dr. Korb reported that Plaintiff was not totally disabled, and would be able to return to work "A.S.A.P."  (Tr. 160).  The ALJ took great care to communicate Plaintiff's entire medical

---

[5]Medline Plus Medical Dictionary, http://www.nlm.nih.gov/medlineplus/hyperesthesia.html (last visited April 26, 2011).

record to this Court, and ultimately found Dr. Korb's reports, which were submitted directly to Plaintiff's attorney, to be less persuasive than those of Plaintiff's other treating physicians. (Tr. 37). Thus, substantial evidence exists in the record that supports the ALJ's finding that Plaintiff did not suffer from a cervical "disorder of the spine" evidenced by nerve root compression.

        b. <u>The ALJ Properly Determined that Plaintiff's Neck Impairments Do Not Satisfy the Requirements of Listing 1.04.</u>

Plaintiff next claims that her cervical injuries satisfy the requirements of Listing 1.04(A) because she suffers from degenerative disc disease, compromise of a root, nerve root compression in the form of cervical radiculopathy, limitation of motion, and sensory loss. (Pl Br. 15). Again, Plaintiff contradicts herself by arguing here that she suffers from degenerative disc disease. (Tr. 15; <u>See</u> Tr. 10). Plaintiff also contends, without proof, that she suffers nerve root compression in the form of cervical radiculopathy. (Tr. 15). Without medical evidence substantiating such a claim, the ALJ's determination that Plaintiff did not suffer from nerve root compression was proper, as evidenced by the normal results of a 2006 cervical spine x-ray, Plaintiff's 2002 MRI results showing no herniation, and Plaintiff's 2007 MRI showing no intrinsic cord abnormality. (Tr. 229, 466, 559-60, 469-72). Plaintiff further argues that she suffered sensory loss and a limitation in motion in her neck and left arm as a direct result of her cervical spinal impairments. (Tr. 15). While such evidence exists on the record, conflicting evidence shows that Plaintiff exhibited a full cervical range of motion during spontaneous movement, and an x-ray taken of Plaintiff's cervical spine in 2006 was normal. (Tr. 424; 559-60). The ALJ properly considered and condensed all evidence in the record, and Plaintiff does not claim that she suffers from additional "disorders of the spine." As such, Plaintiff's claim that she meets the requirements of Listing 1.04(A) due to her allegedly disabling

22

neck injuries is without merit.

           c. <u>The ALJ Properly Combined and Compared Plaintiff's Neck and Back</u>
<u>Impairments Against the Listings.</u>

Finally, Plaintiff claims that the ALJ failed to properly compare and combine her neck and back impairments against the Listings. (Pl. Br. 16). Plaintiff has not sufficiently explained how her injuries, in combination, satisfy the requirements of Listing 1.04, and has not persuaded this Court that the medical evidence demonstrates such a finding. The ALJ properly considered the factual record in light of Listing 1.04 and found that Plaintiff suffered from a "severe combination of impairments," but because she did not present with evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis with inability to ambulate, her combination of impairments did not meet or medically equal the Listings. (Tr. 21-22). After acknowledging the need to combine and compare all impairments, the ALJ referenced his lengthy discussion of Plaintiff's medical history appearing later in the opinion in his step three findings. (Tr. 22). Although <u>Burnette</u> requires the ALJ to fully develop the record and explain his findings under step three, it "does not require the ALJ to...adhere to a particular format in conducting his analysis." <u>Jones v. Barnhart</u>, 364 F.3d at 505. Rather, the purpose of <u>Burnette</u> is to ensure meaningful review though development of the record and explanation of ALJ findings. <u>Id.</u>

The ALJ properly considered Listing 1.04, which encompasses cervical and lumbar spinal injuries, and referenced his more detailed findings later in the opinion in support his conclusion. (Tr. 22-37). It is evident that the ALJ considered Plaintiff's neck and back injuries as a holistic spinal injury, as he plainly notes, "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the Listings." While the ALJ found that

Plaintiff's impairments "could reasonably be expected to produce [her] alleged symptoms," he ultimately concluded that "objective evidence did not support the degree of limitation [Plaintiff] asserted," given the limited findings on MRI's and Plaintiff's normal range of motion during spontaneous activity.  (Tr. 37).  The ALJ referenced and summarized evidence on the record in his conclusion that Plaintiff's complaints and alleged limitations were "basically subjective," "without substantial medical foundation," and "are not consistent with all other evidence."  (Tr. 21, 37).  Moreover, the record shows that the ALJ considered Plaintiff's combination of impairments, as he specifically found that Plaintiff does not have a combination of impairments that meets the Listings.  (Tr. 21).  Thus, there are no grounds for remand for this claim.

### ii.  Depression Disorder

Plaintiff claims that the ALJ improperly determined that she does not suffer from an impairment or combination of impairments that medically equals Listings 12.04 (affective disorders) (Pl. Br. 17).  In order to satisfy the requirements of 12.04, Plaintiff bears the burden of showing that she suffers from a "disturbance in mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. Part 404, Subpart P, Appendix 1.  The requisite level of severity is met when the requirements in 12.04(A) and (B) or 12.04(C) are satisfied.  Id.  Plaintiff argues that the ALJ failed to cite to evidence in the record that Plaintiff's psychological restrictions were "moderate," rather than "marked."  Id. at 19.  In his opinion, the ALJ determined that credible evidence did not establish  the presence of two or more marked functional limitations, as required by 12.04(B).  (Tr. 22).  Rather, the ALJ found that evidence on the record showed "no more than moderate limitations upon [Plaintiff's] daily activities, her social functioning and her ability to maintain concentration, persistence and pace."  Id.  The ALJ also found that the record did not yield evidence that satisfied

the requirements of 12.04(C).  Id.

In his opinion, the ALJ properly notes that Plaintiff has a history of reporting symptoms of depression to her attending psychiatrists, and that Dr. Koschil and Dr. Lanez treated Plaintiff for these symptoms.  (Tr. 26-27).  The ALJ also notes that Plaintiff's mental RFC assessment showed no marked limitations in any category tested.  (Tr. 431-33).  Such evidence supports the ALJ's finding that Plaintiff's restrictions are "moderate," and prevents Plaintiff from arguing that her symptoms satisfy the requirements of 12.04(B) (which requires a showing of "marked" restrictions). Plaintiff's argument that a finding of three "moderate" limitations is equivalent to a finding of two "marked" limitations is not supported by the Regulations, and Plaintiff offers no law to support such a theory.

As to the requirements of 12.04(C), no evidence exists on the record to support an argument that Plaintiff suffers from a chronic affective disorder characterized by repeated episodes of decompensation, a residual disease process, or an inability to function outside of a highly supportive living arrangement.  Plaintiff's treating psychologist, Dr. Lanez's, reported that Plaintiff's abilities to do work- related mental activities were limited due to her forgetfulness and isolation, but found that she could perform activities of daily living.  (Tr. 420, 21).  The ALJ also considered Platintiff's original intake form from Dr. Koschil's office, in which she reported that her leisure activities included walking and exercising, as well as Dr. Korb's April 12, 2004 opinion that Plaintiff was not permanently disabled and could return to work A.S.A.P., in determining that Plaintiff's mental impairments do not satisfy the requirements of 12.04(C).  (Tr. 24, 32).  In fact, rather than decompensating, Plaintiff's symptoms, mood, and sleep improved over the course of treatment with Dr. Lanez.  (Tr. 463).  Thus, Plaintiff's claim is without merit.

25

### iii. Anxiety Disorder

Plaintiff claims that the ALJ improperly determined that she does not suffer from an impairment or combination of impairments that medically equals Listing 12.06 (anxiety-related disorders). (Pl. Br. 17). To satisfy the requirements of 12.06, Plaintiff bears the burden of showing that she suffered from recurring or persistent anxiety accompanied by associated symptoms. 20 C.F.R. Part 404, Subpart P, Appendix 1. The requisite level of severity is met when the requirements of 12.06(A) and (B) or 12.06(C) are satisfied. Id. Plaintiff's limitations do not satisfy the requirements of 12.06(B), which are identical to the requirements of 12.04(B), because her RFC indicates that she suffers from no "marked" limitations. (Tr. 431-33). The ALJ also correctly determined that Plaintiff does not satisfy the requirements of 12.06(C), because substantial evidence establishes Plaintiff's ability to function independently outside of her home, including the fact that she is able to attend her numerous physician visits, she is regularly described as being alert and oriented by attending physicians, she is able to ambulate with a cane, she was able to travel to the Dominican Republic for surgery after the Accident, and her physical RFC assessment showed no limitations in maintaining socially acceptable behavior or setting independent plans. (Tr 37, 393, 425, 456). Thus, Plaintiff's claim must fail.

Accordingly, because the Court finds that the ALJ properly assessed Plaintiff's impairments at step three, Plaintiff's appeal on this basis is denied.

### B. RESIDUAL FUNCTIONAL CAPACITY DETERMINATION

Plaintiff contends that the ALJ improperly determined her RFC for two reasons. First, Plaintiff claims that the ALJ merely recited the evidence on the record without offering justification

for his RFC determination.  Id.  Plaintiff also argues that by noting Plaintiff's ambulating difficulties, the ALJ contradicted himself when he found that Plaintiff has the RFC to perform sedentary work. (Pl. Br. 26).  It is the ALJ's responsibility to determine a claimant's RFC using all relevant evidence in the record.  20 C.F.R. §§§ 404.1527(e)(2),  404.1546, 416.927(e)(2), and 416.946.  An RFC assessment measures the most a claimant can do in a work setting despite her impairments, and involves considerations of a claimant's ability to meet physical and mental requirements of work. 20 C.F.R. §§ 404.1545(a)(4) and 416.945(a)(4).

Plaintiff's first argument, that the ALJ improperly determined her RFC without factual justification, is without merit.  While Plaintiff concedes that the ALJ devoted careful consideration to the entire record (Pl. Br. 25), she contends that the ALJ "invented an RFC without explanation and in direct contradiction to the medical evidence of record."  (Pl. Br. 24-5).  In making a RFC determination, the ALJ must consider all evidence before him, and his assessment must be "accompanied by a clear and satisfactory explanation of the basis on which it refers."  Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981).  Here, the ALJ acknowledged that he carefully considered the entire record, which was evidenced by his thorough summation of Plaintiff's relevant medical history.  (Tr. 22-37).  The ALJ found that Petitioner's "medically determinable impairments could reasonably be expected to produce the alleged symptoms"; however, he noted inconsistencies with Plaintiff's symptoms and her RFC assessments.  (Tr. 36-7).  The ALJ points to medical and opinion evidence throughout his opinion that bolster his sedentary work assessment, including: Dr. Korb's analysis that Plaintiff was not totally disabled; Plaintiff's own report that she worked at a beauty parlor on November 22, 2004; Dr. Koschil's report that Plaintiff had no problems managing money or preparing meals; and Dr. Bagner's finding that although Plaintiff used a cane, no objective

evidence correlated with such a limitation.  (Tr. 24-33).  Thus, Plaintiff's first argument fails.

Plaintiff's second argument, that the ALJ contradicted his overall conclusion that Plaintiff has the RFC to perform sedentary work by noting her use of a cane to ambulate, also fails.  Sedentary work involves sitting, "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools," and a "certain amount of walking and standing." 20 C.F.R. §§ 404.1567(a) and 416.967(a).  Here, the ALJ makes it clear that, after carefully considering Petitioner's assertions and the record as a whole, he did not find claimant's statements about her impairments and their impact on her ability to work credible.  (Tr. 37).  After reviewing Plaintiff's entire medical history, the ALJ found Plaintiff's limitations to be "far in excess of those which would reasonably be consistent with objective medical evidence."  Id.   The ALJ's findings are corroborated by the medical reports from Dr. Saud, Dr. Krohn, Dr. Latif, Dr. Bagner,  Dr. Mirza, Dr. Kantha, and Dr. Korb, as well as Plaintiff's testimony.   Immediately following Plaintiff's Accident, Dr. Saud described Plaintiff's chest x-rays as regular, noted that her gait was steady and brisk, and reported that her motor behavior was normal.  (Tr. 141-49).  Dr. Latif's report supported such findings.  (Tr. 547-50).  Dr. Krohn's report showed that Plaintiff exhibited a limited range of neck motion, marked trigger point tenderness, and lower back pain, but described Plaintiff's April 2003 chest x-ray as unremarkable.  (Tr. 161, 231).  Dr. Bagner's diagnoses reflected Dr. Krohn's findings, and found no evidence of atrophy in Plaintiff's legs, no objective findings to correlate with Plaintiff's use of a cane, and a  normal range of motion in Plaintiff's shoulders, wrists, elbows, forearms, lower back, ankles, and knee during spontaneous activity.  (Tr. 424).  Dr. Kantha's report shows that Plaintiff responded positively to steroid injection treatments.  (Tr. 522-26).  Dr. Korb diagnosed Plaintiff with cervical and lumbar pinched nerves and misalignment of the spinal

vertebrae, but reported that Plaintiff was not permanently disabled and could return to work as soon as April 12, 2004.  (Tr. 160, 191).

Plaintiff's physical RFC assessment indicates that she could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk with normal breaks for about six hours in an eight-hour work day, sit with normal breaks for about six hours in an eight-hour work day, and push and pull to the same extent as lifting and/or carrying.  (Tr. 452).  Plaintiff's physical RFC assessment indicated postural limitations in frequently balancing, stooping and crouching, and occasionally climbing, kneeling and crawling, but reported no manipulative, visual, communicative, or environmental limitations.  (Tr. 453).  The ALJ noted such findings in his RFC determination, and referenced them when he concluded that Plaintiff is limited to performing such postural activities as climbing, balancing, stooping, kneeling, crouching, and crawling occasionally. (Tr. 22).  Nothing in the ALJ's opinion indicates that Plaintiff's use of a cane is supported by objective medical evidence, and his reference to Plaintiff's difficulty with ambulating in his ultimate conclusion in no way suggests that Plaintiff is unable to ambulate without one.

Accordingly, because the Court finds that the ALJ properly assessed Plaintiff's RFC, Plaintiff's appeal on this ground is denied.

## B.  STEP FIVE CLAIM

Plaintiff argues that the ALJ's hypothetical posed to the vocational expert failed to include all of Plaintiff's credibly established limitations, particularly the ALJ's finding that Plaintiff may have had a "moderate difficulty in maintaining social functioning" or the fact that Plaintiff was assessed with a GAF of 45, indicating that she suffers from "serious symptoms e.g., ... any serious impairment of social, occupational or school function."  (Pl. Br. 32).  The Court agrees.  A

29

hypothetical posed by an ALJ must include all of a claimant's impairments.  See Ramirez v. Barnhart, 372 F.3d 546, 552 (3d. Cir. 2004).  Indeed, "where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence."  See Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002).  Furthermore, failure to include credibly established impairments in a hypothetical "necessitates a remand."  See Podewourny v. Harris, 745 F.2d 210, 219 (3d Cir. 1984).

Here, Dr. Gupta assessed Plaintiff's GAF at 45, which indicates that Plaintiff shows serious impairments in social, occupational, or school functioning.  (Tr. 429).  The ALJ noted Plaintiff's GAF in his findings of fact, but did not specifically address her social and occupational limitations in his conclusions, apart from finding that Plaintiff's credibility concerning her "impairments and their impact on her ability to work are not entirely credible in light of discrepancies" between her assertions and the medical evidence.  (Tr. 37).  With respect to Plaintiff's social limitation and occupational limitations, the ALJ's hypothetical which stated only that Plaintiff was limited to "simple, routine, one to two-step jobs in a low contact, low stress setting" was inadequate to convey the claimant's mental deficiencies.  See Ramirez, 372 F.3d at 552.  Plaintiff's limitations, described by Dr. Gupta, are not specifically conveyed in the ALJ's hypothetical, and are instead merely limited to, at best, a job in a low contact setting.  Accordingly, because the Court finds that the ALJ's hypothetical did not properly include all of Plaintiff's credibly established mental limitations, this matter is remanded on this basis.

## V.  **CONCLUSION**

For the reasons stated, this matter is **affirmed in part,** and **remanded** for further proceedings not inconsistent with this Opinion**.** An appropriate order follows this opinion.


 S/ Dennis M. Cavanaugh        
Dennis M. Cavanaugh, U.S.D.J.

Date:          May  4 , 2011
Original:      Clerk's Office
cc:           All Counsel of Record

31